**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONA R. BECHTEL,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civ. 05-298 Erie** |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of Social Security ("the Commissioner"), denying Dona R. Bechtel's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The parties have submitted cross-motions for summary judgment. For the reasons stated below, the Plaintiff's motion for summary judgment is granted and this matter is remanded to the Commissioner for an award of benefits. The Defendant's motion for summary judgment is denied.

## I. General Background

Ms. Bechtel protectively applied for disability insurance benefits on February 5, 2002, alleging disability based on the mental impairments of mood disorders and anxiety disorders since August 20, 2001. Her application was initially denied, and she requested a hearing. Ms. Bechtel, represented by counsel, appeared and testified at an administrative hearing before Administrative Law Judge ("ALJ") Barbara Gibbs on February 4, 2003. (R. at 283-339). A vocational expert, Fred Monaco, also testified at the hearing. On April 7, 2003, the ALJ issued her decision denying disability benefits and finding that Ms. Bechtel was not disabled. (R. at 16-24.) Ms. Bechtel requested a review by the Appeals Council.

The Appeals Council denied Ms. Bechtel's request for review on August 11, 2005, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 7-10.) In

denying the request for review, the Appeals Council considered Ms. Bechtel's reasons for disagreeing with the ALJ's decision as well as additional evidence she submitted. (R. at 7-8, 10.) The additional evidence considered was a May 14, 2003 letter from Ms. Bechtel's counsel (R. at 259), a May 8, 2003 altered diagnoses from the Regional Counseling Center (R. at 260), a May 8, 2003 letter from Ms. Bechtel (R. at 261-262), a March 10, 2003 progress note from the Regional Counseling Center (R. at 263), medical records from Roberta Kahler, M.D., dated March through June, 2003 (R. at 264-269), a July 28, 2003 letter from Ms. Bechtel's counsel (R. at 270), and medical records from the University of Pittsburgh Medical Center dated November through December, 2003 (R. at 271-282). In addition, the Appeals Council also "considered the fact that since the date of the Administrative Law Judge's decision, [Ms. Bechtel was] found to be under a disability beginning April 21, 2003, based on the application [she] filed on June 23, 2003; however, the Council found that this information does not warrant a change in the Administrative Law Judge's decision." (R. at 8.) Following the Appeals Council action, Ms. Bechtel filed this action seeking judicial review of the ALJ's decision.

Ms. Bechtel was born on November 11, 1953, has a high school education, is married and has two children. She has past work experience as a deli worker and telemarketer.

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34,38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents

him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); *see also* 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals for the Third Circuit sets forth the five-step procedure as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled*See* 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See*, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

For mental impairments, an additional regulatory process supplements the five- step process outlined above:

> [This process] require[s] the hearing officer (and ALJ) to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists. If an impairment is found, the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. The examiner must then rate the degree of functional loss

> resulting from the impairment in certain areas deemed essential for work. If the mental impairment is considered "severe", the examiner must then determine if it meets a listed mental disorder. If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment. At all adjudicative levels, a Psychiatric Review Treatment Form ("PRT form") must be completed. This form outlines the steps of the mental health evaluation in determining the degree of functional loss suffered by the claimant.

Knight v. Barnhart ,195 F.Supp.2d 569, 578-79 (D.Del. 2002).

The claimant carries the initial burden of demonstrating by medical evidence that he is unable to return to his previous employment due to a medically determinable impairment. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this burden, steps one through four described supra, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. Id.

**III. ALJ's Decision**

In summary, the ALJ found that based on Ms. Bechtel's exertional and non-exertional mental limitations and the claimant's age, education, and work experience, Ms. Bechtel is not under a "disability." (R. at 23-24.) In particular, the ALJ found that Ms. Bechtel retains the "residual functional capacity to perform light exertional work activities with a sit/stand option at a low stress level (unskilled work with routine and repetitive process involving things rather than people) that requires less than occasional contact with supervisors and coworkers and no contact with the public." (R. at 23.)

The ALJ undertook the five-step sequential evaluation in determining that Ms. Bechtel was not disabled. The ALJ made the following findings:

> (1) that Ms. Bechtel had not engaged in substantial gainful activity since August 20, 2001;
>
> (2) that Ms. Bechtel suffers from mood and anxiety disorders, impairments which are considered severe;
>
> (3) her mental impairments, although severe, do not meet or equal the criteria of the Listing of Impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4;
>
> (4) she retains the residual functional capacity for light work with the following limitations: a sit/stand option at a low stress level, unskilled work with routine and repetitive process involving things rather than people, requires less than occasional contact with supervisors and coworkers, and requires no contact with the public; and

> (5) based on her age, educational background, work experience, and residual functional capacity Ms. Bechtel was able to perform some light work which exists in significant numbers in the national economy, such as a bench assembler, a hand packer, and a hand marker; and she is able to perform sedentary work which exists in significant numbers in the national economy, such as a bench assembler, a hand packer, and a hand marker.

The ALJ also found that Ms. Bechtel's allegations regarding her limitations are not totally credible. (R. at 23, 20-21.) The ALJ explained that Ms. Bechtel's impairments could "reasonably be expected to cause some of the symptoms described from time to time, but not the degree of limitation alleged." (R. at 20.) The ALJ also explained that Ms. Bechtel

> has generally done well with her past medications for depression and anxiety, and she has recently started counseling for the first time. [Ms. Bechtel] alleged sleep problems, but the medical records indicate she drinks coffee in the middle of the night. She alleges that she has difficulty concentrating, but she drives occasionally, shops with her husband, [and] watches television approximately two hours per day. Although she had done little in the year before the hearing, she also enjoys doing "trash to treasure" type craft projects. Thus the claimant is only partially credible.

(R. at 20-21.)

Ms. Bechtel's medical records indicate treatment for both mental impairments and physical impairments. As noted, Ms. Bechtel seeks disability benefits based on her mental impairments, and thus the medical evidence regarding her mental impairments is of primary concern. However, the medical records regarding her physical impairments are important insofar as they impact on her mental impairments; *e.g*, weight gain affecting depression. The ALJ reviewed medical evidence regarding both her physical and mental impairments. The ALJ specifically noted that Ms. Bechtel's low back pain, incisional hernia, and obesity were not severe impairments, but the ALJ did consider these impairments in establishing her residual functional capacity. (R. at 20.)

**IV. <u>Analysis</u>**

Ms. Bechtel argues that the ALJ misapplied the regulations for evaluating the findings of treating and consulting experts, mis-characterized expert medical evidence, and failed to analyze and make findings regarding expert medical evidence. As a result she argues that the ALJ's decision is not supported by substantial evidence.

More specifically, Ms. Bechtel argues that the ALJ erroneously rejected her treating physician's opinion, stated at two different times, that Ms. Bechtel is unable to hold or sustain any type of gainful employment because of her inability to remember work-like procedures, her inability to understand short, simple instructions, and her inability to maintain attention for an extended time. (Plaintiff's Brief, at 16-17.) Moreover, she argues that the ALJ failed to acknowledge that Ms. Bechtel's treating physician's opinion is supported not only by his own medical records, but also by medical evidence from the state agency evaluating psychologist and by medical records from the Regional Counseling Center. (Plaintiff's Brief, at 17-19.) With this focus in mind we set forth the relevant medical evidence.

**A. Relevant Medical Evidence**

The medical evidence in this case goes as far back as April, 2000, not all of which is relevant on appeal. We address primarily the relevant medical evidence at issue regarding her mental impairments, and such medical evidence regarding her physical impairments as necessary.

**1. Treatment from Primary Care Physician Roberta Kahler, M.D.**

Roberta Kahler, M.D. is Ms. Bechtel's primary care physician. In April, 2000, Dr. Kahler referred Ms. Bechtel to the surgery department at the University of Pittsburgh Medical Center who recommended that Ms. Bechtel undergo laparoscopic gastric bypass due to morbid obesity. (R. at 237-238.) Dr. Anita P. Courcoulas from the surgery department noted that Ms. Bechtel took medication for bipolar disease and had "obesity-related morbidity" of depression. (R. at 237.) The gastric bypass surgery was performed on December 12, 2000. (R. at 235.)

In June, 2001, Ms. Bechtel had to take off work at times due to her bipolar disease, and she also sought a referral from Dr. Kahler to a new psychiatrist. (R. at 189, 188.) On September 4, 2001, Ms. Bechtel reported to Dr. Kahler that she was not working and complained of difficulty concentrating, increased crying, and moodiness. (R. at 187.) At an office visit on September 11, 2001, Dr. Kahler's notes state that most of Ms. Bechtel's complaints "seem related to psych problems." (R. at 187.) In January, 2002, the medical records indicate that Ms.

Bechtel was "on multiple meds for long standing depression, and was assessed as having "long term depression." (R. at 184-185.) In October, 2002, her medical record indicates her problem as "severe depression." (R. at 177.)

**2. Treatment with Treating Psychiatrist, Tariq Qureshi, M.D.**

Ms. Bechtel began treatment with psychiatrist Tariq Qureshi, M.D. at Western Psychiatric Institute and Clinic's UPMC Behavioral Health North West Unit in Meadville, Pennsylvania, on July 9, 2001. (R. at 141-142.) Dr. Qureshi gave the following undisputed concise history leading up to the time period at issue in this case as follows:

> This is a 47-year-old white married female who states that her emotional difficulties started 12 years ago. At that time, she complained of excessive high mood, irritability, increased need for sleep, increased energy and activity, increased talking, racing thought, being easily distracted, and disturbed ability to make decisions. She was seen by Dr. Gelfand of Oil City. He diagnosed her with Bipolar Disorder and panic attacks. She was initially treated with Xanax and finally she was treated with Lithium Carbonate, which stabilized her. Later on, she had two or three hospitalizations in Oil City Hospital under the care of Dr. Gelfand because of Bipolar Disorder. Five years ago, she had [seven] electric shock treatments given by Dr. Gelfand because she was severely depressed and she was having disturbed ability to make decisions. After Dr. Gelfand left, she was seen by Dr. Gonzales and later on by Dr. Hazlett of Franklin. Both of these psychiatrists left and she ended up going to Dr. Bil in Clarion. Dr. Bil was practicing in Franklin and he moved to Clarion and so she was out of psychiatrists and now she has been referred to this center for further care. About six months [ago] she had gastric bypass surgery done in Pittsburgh and she was taken off Lithium by Dr. Bil and she states that she has been doing well and her moods have been stable and she has not gone into manic or depressive stages of bipolar illness. She is now on Effexor 150-mg daily and she states that she feels well on this medication.

(R. at 141.)

Dr. Qureshi summarized her Mental Status as follows:

> This is a 47-year-old female who appears to be of her stated age. She is cooperative during the interview. Her eye contact is good., Her mood is euthymic. Her affect is appropriate to her mood. Her thoughts are well organized and goal directed. Her speech is slightly pressured. her attention and concentration is poor. She was somewhat forgetful during the interview. She denies delusions, hallucinations, and suicidal or homicidal thoughts. She denies any obsessions, compulsions, or phobias but has a history of panic disorder with some degree of agoraphobia. She is fearful of crowds. She is oriented to time, place, and person. Recent and remote memories are good. Insight and judgment is fairly good.

(R. at 142.) Dr. Qureshi diagnosed Ms. Bechtel with Bipolar I Disorder most recent episode,

depressed, severe without psychotic features, and Panic Disorder with agoraphobia. (R. at 142.) He placed her global assessment functioning at 65. (R. at 142.) His treatment plan stated that she wishes to continue with Effexor XR at 150 mg per day; there are no current symptoms of Bipolar Disorder; that she does not want to be on Lithium at this time; and that she will be seen at this facility periodically for medication checkups. (R. at 142.)

She returned for her second visit on August 6, 2001, at which time she was complaining of "mood swings, [unreadable], increased energy alternating with periods of depression," thus Dr. Qureshi added Depakote to her medications. (R. at 146, 148.) Two weeks later, on August 20, 2001, the Depakote was stopped due to side effects. (R. at 145.) Ms. Bechtel had increased anxiety and complained of irritability, mood swings, and suspiciousness (R. at 145.) Dr. Qureshi increased her Effexor to twice a day, and added Zyprexa. (R. at 145, 148.)

Eleven days later, on August 31, 2001, Ms. Bechtel returned to Dr. Qureshi complaining of poor concentration and an inability to focus. (R. at 145.) She also reported that with the Zyprexa she was much improved regarding her irritability and suspiciousness. (R. at 145.) Dr. Qureshi added Wellbutrin to her medications. (R. at 145, 148.) However, only four days later he stopped the Wellbutrin due to Ms. Bechtel experiencing increased irritability and agitation, and restarted her on Lithobid, a lithium medication. (R. at 145, 148.)

Dr Qureshi wrote a prescription for Ms. Bechtel dated September 10, 2001, which stated "Donna Bechtel is advised to be on sick leave until she sees me again on 9/18/01." (R. at 240.) On September 18, 2001, Ms. Bechtel complained of a "wobbly feeling" and lightheadedness. (R. at 144.) She also complained of being depressed and that she cannot focus. (R. at 144.) Dr. Qureshi decreased her Lithobid due to high lithium levels in her blood, and also decreased her Effexor. (R. at 144, 148.) On September 19, 2001, Dr Qureshi wrote a prescription for Ms. Bechtel stating "Dona is recommended sick leave until further notice." (R. at 240.)

On October 2, 2001, her lithium levels had decreased and she no longer experienced wobbling, but she still complained of irritability, sleepiness, nervousness, and anxiety. (R. at 144.) In addition, she explained that she becomes exhausted, forgetful, worried, and confused,

that it is hard to focus, and that she has poor concentration. (R. at 144.) Medications remained the same. (R. at 144, 148.)

On October 31, 2001, Ms. Bechtel was stable but her attention and concentration remained poor, and she was still forgetful and fretful. (R. at 144.) She also had low frustration tolerance and gets angry easily. (R. at 144.) Current medications were continued and Dr. Qureshi stated that he doubted that Ms. Bechtel would be able to work under these circumstances. (R. at 144, 148.) On November 29, 2001, Dr. Qureshi reported that Ms. Bechtel was still depressed and her attention and concentration were poor and that she had no motivation. (R. at 144.) On December 24, 2001, Dr. Qureshi reported that she was still irritable, and was experiencing mood swings. (R. at 143.) He increased her Zyprexa. (R. at 143, 148.)

In a letter opinion dated December 26, 2001, Dr. Qureshi recounted Ms. Bechtel's history and stated that she "is being seen by the undersigned on a regular basis." (R. at 239.) He further stated:

> This patient is still anxious, irritable, exhausted, forgetful, and confused. Her attention and concentration is quite impaired. Her mood swings persist. On December 24, 2001 her Zyprexa was increased to 5 mg at bedtime. Because of poor attention and concentration she will be unable to remember work like procedures and unable to understand very short and simple instructions or maintain attention for extended periods of time.

(R. at 239.) He gave his opinion that "she will be unable to hold or sustain any type of gainful employment under current emotional status." (R. at 239.)

On February 4, 2002, he noted that Ms. Bechtel was functioning marginally, her mood and affect were dysthymic, and her affect was blunted. (R. at 143.) On May 2, 2002, Ms. Bechtel reported increased irritability and racing thoughts, along with wrath at her husband. (R. at 143.) Her Zyprexa was again increased, and Dr. Qureshi noted that there were no manic symptoms yet. (R. at 143, 148.)

On June 6, 2002, Dr. Qureshi's progress notes indicate that Ms. Bechtel remained irritable, with poor concentration, racing thoughts, and periodic temper problems. (R. at 243.) On July 24, 2002, Dr. Qureshi reported that she was doing well on her medications, but stopped

the Zyprexa due to side effects. (R. at 243, 242.) Medication notes indicate that Ms. Bechtel saw Dr. Qureshi again on October 23, 2002, and December 11, 2002, but there are no progress notes in the record. (R. at 242.)

Dr. Qureshi issued another opinion letter, dated October 10, 2002, in which he recounts Ms. Bechtel's recent history under his care, noting that she "was coming to see me on a regular basis every two to four weeks and she had episodes of depression and mood swings and irritability." (R. at 244.) Dr. Qureshi also set forth Ms. Bechtel's mental difficulties as follows:

> The patient suffers from severe emotional difficulties. Her attention and concentration remains impaired. She is still very suspicious and guarded. She is unable to focus. She has periods of nervousness, anxiety, irritability and at times she is not sleeping well and other times sleeping too much. She becomes exhausted easily and has periods of forgetfulness and confusion. Although she has shown improvement since her initial contact.

(R at 244.) He gave his opinion as "the patient is unable to hold any type of gainful employment at this time." (R. at 244.)

**3. Treatment with Venango County Mental Health**

Ms. Bechtel lost her insurance sometime in the fall of 2002, and had to enter the County program, which began with an evaluation at Venango County Mental Health on November 4, 2002. (R. 250-252.) She reported difficulty with sleeping, being generally anxious whenever she has to leave the house, has panic attacks, mood swings, her concentration is impaired, and she cannot concentrate to read. (R. at 250.) She reported that she believed that her current medication of Lithium and Effexor is an effective combination for her. (R. at 251.)

The interviewer stated that Ms. Bechtel appeared to be intelligent and made good eye contact, she gave information easily and appeared to be comfortable with the intake process, she seemed fairly stable, appeared to be motivated for treatment, and would like to improve her ability to sleep and her concentration so she can read again. (R. at 251.) The recommendations from Venango County Mental Health were individual outpatient therapy, a psychiatric evaluation, and medication checks. (R. at 252.)

**4. Treatment with Regional Counseling Center**

Medical records from the Regional Counsel Center in Oil City, Pennsylvania, indicate that Ms. Bechtel treated with the Center from November 8, 2002 through March 10, 2003. (R. at 245-249; 263.) Ms. Bechtel came to the Regional Counseling Center with a Chief Complaint of a "Long history of depression and having been called bipolar." (R. at 245.)

A January 15, 2003 Psychiatric Evaluation report completed by Physician Assistant Caryn Dudinsky noted that Ms. Bechtel stated that her mood is down and that she has fleeting suicidal thoughts. (R. at 245.) Regarding Ms. Bechtel's alleged manic history, the report notes that she reported that she had no more than 5 "manic" episodes, described as having more energy, being more talkative, and feeling better than what a normal person would feel. (R. at 245.) However, she has never had any related manic behaviors of grandiosity, risky behavior, going for more than a day or two without sleep, or lack of fatigue when she does not sleep. (R. at 245.) Regarding her sleep problems, Ms. Bechtel stated that she has difficulty sleeping at night.

Ms. Bechtel also stated that she has a history of panic attacks, and generalized anxiety with irritability, difficulty sleeping, and muscle tension. (R. at 246.) Ms. Dudinsky reported that Ms. Bechtel "described a great deal of anhedonia," which is a symptom of depression, defined as the loss of interest or pleasure in daily activities. (R. at 246.) Ms. Bechtel also reported that she had been isolating herself, rarely coming out of the house except for psychiatric and therapy appointments. (R. at 246.) She had recently joined the Women's Group at the Regional Counseling Center and reported that she enjoyed it a great deal. (R. at 246.)

The mental status exam section of the report states that Ms. Bechtel was "quite talkative and open," her mood was fair, she appeared somewhat saddened and withdrawn at times, and that she had had some improvement with her current medications but she continues to have residual depressive symptoms. (R. at 247.) The assessment noted that she had been called bipolar in the past, but she did not meet the criteria for a real manic episode, and has not had even vaguely manic symptoms in many years. (R. at 247.) As a result, Ms. Dudinsky

"discussed with her the possibility that she was experiencing more depression than truly bipolar disorder." (R. at 248.) Ms. Bechtel's mental impairment diagnosis was Major depressive disorder recurrent, moderate with a history of suicidal ideation; Dysthymia; Panic disorder without agoraphobia by history; and Generalized anxiety disorder, rule out bipolar disorder. (R. at 248.) Her global assessment functioning was placed at 45-50. (R. at 248.)

**5. Non-Treating State Agency Evaluator Peter Nachtwey, Ph.D.**

Ms. Bechtel was evaluated by the State Agency Psychologist Peter Nachtwey, Ph.D., on June 6, 2002. (R. at 150.) Dr. Nachtwey completed a report on his evaluation, which included administering the Bender-Gestalt test and a Mental Status Exam. (R. at 15-156.) Ms. Bechtel reported to Dr. Nachtwey that she was off work because she is "unable to focus, gets lost, loses concentration, and can't follow direction." (R. at 150.) Dr. Nachtwey listed her activities of daily living as having coffee and medications upon arising, going over lists she has made, watching televisions shows, lunch, two-hour naps (75% of the time), supper, and puttering. (R. at 151.) His mental impairment diagnoses were Bipolar disorder, most recent episode unspecified (in partial remission with medication), and Obsessive-compulsive personality disorder. (R. at 152.) He placed her global assessment functioning at 45. (R. at 152.)

With regard to making occupational adjustments, Dr. Nachtwey reported that Ms. Bechtel had good ability to relate to co-workers, use her judgment, and interact with supervisors. (R. at 153.) He reported that she had fair ability to follow work rules, deal with the public, and function independently. (R. at 153.) Finally, he reported that Ms. Bechtel had poor ability to deal with work stresses and to maintain attention and concentration. (R. at 153.)

With regard to making performance adjustments, Dr. Nachtwey reported that Ms. Bechtel had good ability to understand, remember, and carry out simple job instructions; fair ability to understand, remember, and carry out detailed, but not complex job instruction; and poor ability to understand, remember, and carry out complex job instructions. (R. at 153.)

With regard to making personal-social adjustments, Dr. Nachtwey reported that Ms. Bechtel had very good ability to maintain personal appearance; and fair ability to behave in an

emotionally stable manner, to relate predictably in social situations, and to reliability. (R. at 154.) Dr. Nachtwey gave a "guarded" prognoses based on the effectiveness of medication and whether or not she will engage in counseling/psychotherapy. (R. at 152.)

**6. Non-Evaluating State Agency Reviewer Ray Milke, Ph.D.**

Ray Milke, Ph.D., assessed Ms. Bechtel and completed a Psychiatric Review Technique Form ("PRTF") dated July 2, 2002, and a mental residual functional capacity form dated July 3, 2002. (R. at 157-170; 171-174.) Dr. Milke's opinion on the PRTF was that Ms. Bechtel had moderate limitations in her activities of daily living, moderate limitations in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 167.) On the mental residual functional capacity form, Dr. Milke reported that Ms. Bechtel was not significantly limited or only moderately limited in all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. at 171-172.)

Dr. Milke opined that Ms. Bechtel "possesses the residual functional capacity to understand, retain, & follow simple instructions & directions & can do simple, low stress, routine & repetitive work." (R. at173.) Dr. Milke found the claimant's allegations of disability to be partially credible. (R. at 173.) In conducting his assessment Dr. Milke relied upon Dr. Nachtwey's June 6, 2002 report, Dr. Qureshi's July 9, 2001 psychiatric evaluation report, and progress notes from UPMC Behavioral Health July 9, 2002 through May 5, 2002. (R. at 173.) Significantly, Dr. Milke did not review Dr. Qureshi's December 26, 2001 report

**B. <u>Discussion</u>**

The ALJ primarily bases her decision on rejecting Dr. Qureshi's opinion that Ms. Bechtel was not capable of holding gainful employment, explaining that it was not supported by the complete objective medical evidence. The ALJ also found Ms. Bechtel to be only partially credible as to the degree of limitation alleged. Thus, we will first address the medical evidence cited in support of the ALJ's decision, followed by a discussion of the ALJ's credibility determination.

**1. Evaluation of the Medical Evidence**

Treating physicians' reports should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2). "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2); and Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

"Because non-examining sources do not have an examining or treating relationship with the claimant, the weight accorded to their opinions depends upon the degree to which they provide supporting explanations for their opinion." 20 C.F.R. §§ 404.1527, 416.927. To the extent the explanations are consistent with the other substantial evidence in the case, such opinions from non-treating sources are entitled to more weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). Finally, an ALJ is not bound by findings of a state agency medical or psychological consultant. 20 C.F.R. §§ 404.1527, 416.927.

An ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. Fargnoli, 247 F.3d at 37. When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983).

The ALJ credited Dr. Qureshi's opinion with minimal weight based on her rejection of his opinion that Ms. Bechtel's primary limitation was in maintaining concentration and attention.

(R. at 21, citing Dr. Qureshi's October 10, 2002 opinion.) In support of discounting Dr. Qureshi's opinion, the ALJ explained that later psychological evaluations, dated November 4, 2002 and January 15, 2003, made no finding of concentration and attention deficits. (R. at 21.) In addition, the ALJ notes that at the initial evaluation Dr. Qureshi did not detect or comment on concentration and attention deficits, he recommended only medication checks every two months, and he did not recommend any other form of therapy. (R. at 21.) According to the ALJ, the only reason Dr. Qureshi eventually mentioned Ms.. Bechtel's concentration and attention problems was due to Ms. Bechtel herself complaining of these problems on August 31, 2001. (R. at 21) Moreover, the ALJ found that Ms. Bechtel was only partially credible, thus her complaints of these problems to Dr. Qureshi are not reliable. (R. at 20-21.) In addition, the ALJ notes that despite the complaints, Dr. Qureshi did not administer any objective tests to determine if the claimant actually had such problems. (R. at 21.)

Our review of the medical evidence in comparison to the ALJ's characterization of the same evidence suggests a less than thorough examination of the record evidence. Dr. Qureshi's records show a much more detailed treatment and management of Ms. Bechtel's impairments at odds with the conclusions reached by the ALJ.

First, the ALJ supports her rejection of Dr. Qureshi's opinion, in part, because "Dr. Qureshi did not detect or comment on the claimant's concentration and attention deficits during his initial evaluation." (R. at 21.) This is not accurate and is even contradicted in the ALJ's own review of the medical evidence.

The ALJ noted Dr. Qureshi's initial evaluation in her discussion of the evidence and accurately recounted that the evaluation shows that Ms. Bechtel "was somewhat forgetful during the interview, and **her concentration and attention were poor**." (R. at 18 (emphasis added).) Dr. Qureshi in fact stated "Her attention and concentration is poor." (R. at 142.) Thus, contrary to the ALJ's statement in her opinion, Dr. Qureshi did detect and comment on Ms. Bechtel's concentration and attention deficits during his initial evaluation.

In addition, Dr. Qureshi's comment on her concentration and attention deficits on July 9, 2001, shows that it is not true that the only reason Dr. Qureshi mentioned Ms. Bechtel's concentration and attention problems was due to Ms. Bechtel herself complaining of these problems on August 31, 2001. Moreover, her disability claim alleges disability from August 20, 2001, which would be consistent with her emphasizing these symptoms on August 31, 2001.

The ALJ also implied that the only other instances when attention and concentration problems were noted in Dr. Qureshi's records were on August 31 and October 31, 2001, when Dr. Qureshi noted that her attention and concentration remained poor. (R. at 21.) However, the medical evidence shows that attention and concentration problems were also referred to in Dr. Qureshi's records dated October 2 and November 29, 2001, and June 6, 2002. (R. at 144, 243.)

In reviewing the medical evidence from Dr. Qureshi, the ALJ specifically mentioned only three visits. (R. at 18.) The ALJ's reference to Dr. Qureshi's progress note for February 4, 2002, is indicative of a less than thorough examination of the evidence. The ALJ reports that according to Dr. Qureshi, on February 4, 2002 Ms. Bechtel was "functioning pretty well with a dysthymic mood and affect." (R. at 18.) We believe we correctly read this record as stating that Ms. Bechtel is functioning "marginally," while the ALJ appears to have read it as the phrase functioning "pretty well." (R. at 143.) The February 4, 2002 progress note states as follows:

> Donna is functioning marginally. Her mood & affect are dysthymic. Denies paranoid ideation. Affect blunted. Denies auditory hallucination. Continue current medication.

(R. at 143.) In context it makes sense that Dr. Qureshi meant that Ms. Bechtel was functioning "marginally," rather than "pretty well." Dysthymic means a lack of enjoyment or pleasure in life, while a blunted affect is described as a lack of emotional reactivity, both of which are consistent with someone who is functioning marginally and inconsistent with someone who is functioning pretty well.

Next, the ALJ states that Dr. Qureshi recommended medication checks every two months, implying that all Dr. Qureshi was doing was superficial medication checks, and that "every two months" indicates a less than serious problem. However, in his initial evaluation Dr.

Qureshi did state that Ms. Bechtel would be seen periodically for medication check-ups, but he did not space them out at every two months. (R. at 142.) The record evidence demonstrates that in fact Dr. Qureshi saw Ms. Bechtel nine times in the first six months he treated her, leading up to his December 26, 2001 opinion. In addition, the record indicates that phone consultations were also conducted during this time period as well. (R. at 240.) Moreover, as recounted above, Dr. Qureshi's detailed progress notes indicate that he was actively treating Ms. Bechtel in response to her complaints, and that he was not merely checking her medications without reference to his own observations and expertise as her treating psychiatrist.

The ALJ also relies on two later psychological evaluations that allegedly contradict Dr. Qureshi's opinion. According to the ALJ, in neither of these evaluations did the evaluator find that Ms. Bechtel had concentration and attention deficits. (R. at 21, citing Venango County Mental Health evaluation November 4, 2002, R. at 250-252; and Regional Counseling Center evaluation, January 15, 2003, R. at 245-248.) Initially we note that neither of these reports was completed by a psychiatrist. A physician's assistant completed the Regional Counseling Center's report, and a person identified only as "interviewer" completed the Venango County Mental Health Evaluation. (R. at 248 & 252.) Nonetheless, the Venango County Mental Health interviewer did note that Ms. Bechtel reported that her concentration is impaired and she cannot concentrate to read. (R. at 250.) While the physician's assistant did not state that Ms. Bechtel's concentration and attention are impaired, the report as a whole does not show a contradiction with Dr. Qureshi's opinion. Moreover, the physician's assistant assigned Ms. Bechtel a global assessment functioning of 45-50, consistent with the global assessment functioning of 45 given by state agency psychologist Dr. Nachtwey in June 2002. The decline of global assessment functioning from 65, assigned by Dr. Qureshi in July 2001, to 45 in June 2002 and January 2003, also corresponds to Dr. Qureshi's opinion regarding Ms. Bechtel's abilities: on her first visit he placed her at 65, but thereafter she declined.

Given that Dr. Qureshi's medical evidence is actually stronger than noted by the ALJ, combined with the fact that he was Ms. Bechtel's treating psychiatrist over a long period of time,

we cannot say that these two evaluations constitute substantial medical evidence contradicting Dr. Qureshi's opinion.

The ALJ also gave minimal weight to Dr. Qureshi's opinion because he failed to give objective tests to determine if the claimant actually had concentration and attention problems. (R. at 21.) It is unclear what objective tests the ALJ thought should be administered, but the only "objective" test administered to Ms. Bechtel in the medical evidence was the Bender test given by Dr. Nachtwey. Moreover, Dr. Qureshi's evaluations are based on his experience and expertise and, as such, are considered valid objective medical evidence. There are no objective test results in the medical evidence that show that Ms. Bechtel does not have deficits in attention and concentration. Reviewing all of the medical evidence reinforces, rather than contradicts, Dr. Qureshi's opinion.

**2. Credibility Determination**

Finally, the ALJ found that Ms. Bechtel's complaints of attention and concentration problems were only partially credible. (R. at 20-21.) This is a critical finding underpinning the ALJ's assignment of minimal weight to Dr. Qureshi's opinion because if Ms. Bechtel's complaints are not credible, then Dr. Qureshi's opinion is also not credible insofar as he relied on Ms. Bechtel's complaints.

It is the responsibility of the ALJ to make credibility determinations. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). The ALJ's credibility determination is entitled to deference by this Court. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3rd Cir. 1983); Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The ALJ, as the finder of fact, can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. See Baerga v. Richardson, 500 F.2d 309, 312 (3rd Cir. 1974).

"If the ALJ determines that the claimant's subjective testimony is not fully credible, the ALJ is obligated to explain why. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir.2002) (quoting Burnett, 220 F.3d at 120). The ALJ may reject subjective complaints "if he affirmatively

addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his conclusions in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). When the ALJ is faced with conflicting evidence, "he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000)(quotations and citations omitted). A district court need not defer to the ALJ's credibility determinations that are not supported by substantial evidence. Smith, 637 F.2d at 972; Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).

We find that the ALJ's credibility finding is not based on substantial evidence as it lacks support in the record. The ALJ explained as follows:

> The claimant alleged sleep problems, but the medical records indicate she drinks coffee in the middle of the night. She alleges that she has difficulty concentrating, but she drives occasionally, shops with her husband, watches television approximately two hours per day. Although she had done little in the year before the hearing, she also enjoys doing "trash to treasure" type craft project. Thus, the claimant is only partially credible.

(R. at 21.)

We are unable to find any reference in the medical records suggesting drinking coffee is causing Ms. Bechtel's sleep problems. The evidence related to this comes solely from the ALJ's questioning Ms. Bechtel about her sleep difficulty. (R. at 298-301.) Ms. Bechtel testified that she falls asleep and wakes up approximately 30 minutes later and is up for hours downstairs, not turning the lights on, doing nothing, and maybe having some coffee. (R. at 298-299.) The ALJ then appears to make her own medical conclusion that Ms. Bechtel's sleep problems are due to her drinking coffee at night and taking naps in the day. (R. at 299-300.)

However, the medical evidence is consistent in reporting that Ms. Bechtel has difficulty sleeping at night. Moreover, such sleep disturbances are consistent with impairments of bipolar disorder, depression, anxiety, and panic disorder. Mason, 994 F.2d at 1067 (There need not be objective evidence of the symptom itself, but there must be objective evidence of some condition that could reasonably produce the symptom), citing Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir.1984). Thus, rather than mental impairments causing Ms. Bechtel's sleep difficulties

(and that Ms. Bechtel unhelpfully has coffee when she wakes up at night), the ALJ concluded on her own that the cause of her sleep problems is actually drinking the coffee and taking daytime naps. Because the medical evidence supports that Ms. Bechtel has severe mental impairments that cause sleep difficulties, the ALJ impermissibly substituted her own lay opinion in disregard of the medical evidence. Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989), Frankenfield v. Bowen, 861 F.2d 405 (3d Cir. 1988).

We are at a loss to understand why the ALJ concluded that driving occasionally, shopping with a spouse, and watching television (an activity that would appear to be attractive to someone who has trouble with concentration) supports the conclusion that the claimant does not have difficulty concentrating. Nothing about any of these activities shows a general ability to concentrate that would undermine Ms. Bechtel's testimony regarding her trouble with attention and concentration. Moreover, her testimony indicates that she goes shopping only once per month for about an hour, and drives only to the neighborhood grocery store. (R. at 303-304.)

Finally, the ALJ appears to have misread the evidence in stating that although Ms. Bechtel "had done little in the year before the hearing, she also enjoys doing 'trash to treasure' type craft project." (R. at 21.) These two statements -- that she claims to have done little, but in fact she has done trash to treasure projects -- are arranged so as to appear to be contradictory. However, the evidence shows that Ms. Bechtel has done very little in the past year, including not doing "trash to treasure" projects or any craft projects in the past year. (R. at 308 (has not done trash to treasure project in a year), 309 (has not done any craft projects for a year).) Thus, we fail to see how these statements impact at all on Ms. Bechtel's attention and concentration difficulties.

Based on our review of the record evidence, we find that the ALJ's credibility finding is in error insofar as the ALJ found Ms. Bechtel to be not credible with regard to her attention and concentration limitations.

**C. Residual Functional Capacity Determination**

Based on the medical records we find that the objective medical evidence is consistent with Ms. Bechtel's report of her limitations with regard to her attention and concentration. We therefore conclude that the vocational expert's assessment of Ms. Bechtel's ability to perform work was based on a flawed hypothetical because it failed to account for her attention and concentration limitations.

> The United States Court of Appeals for the Third Circuit instructs that a vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.

Burns, 312 F.3d at 123 (citations omitted); see also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). The original hypothetical posed by the ALJ did not reflect all of Ms. Bechtel's impairments. (R. at 334-337.) In response, the vocational expert testified that there were jobs that Ms. Bechtel could perform. (R. at 335-337.) However, the ALJ did ask the vocational expert to also consider Ms. Bechtel's attention and concentration difficulties, and how that would the availability of jobs she could perform. (R. at 337.) In response, the vocational expert testified that in that case all jobs for Ms. Bechtel would be eliminated. (R. at 337-338.) Accordingly, we will find that Ms. Bechtel is disabled.

**C. <u>Substantial Evidence</u>**

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000) (quoting Smith, 637 F.2d at 970).

Reviewing the supporting evidence and the ALJ's reasoning and review of the evidence as it underlies the ALJ's opinion, we find that the ALJ's rejection of Dr. Qureshi's opinion is not supported by substantial evidence. The ALJ failed to adequately assess medical records from

Dr. Qureshi in that her rejection of his opinion was based on three inaccurate statements about Dr. Qureshi's own records and an inaccurate statement about the Venango County Mental Health report. The ALJ also did not point to medical evidence that actually contradicted Dr. Qureshi's opinion, but only pointed to one insubstantial medical record by a physicians assistant that did not mention attention and concentration problems, but was otherwise consistent with the other substantial medical evidence. Finally, the ALJ's credibility finding was not adequately supported by explanation or by citation to record evidence, was contradicted by testimony from the actual hearing, and appeared to be primarily based on the ALJ's own lay conclusion.

With regard to determining Ms. Bechtel's residual functional capacity the ALJ did not consider "all relevant evidence." Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett, 220 F.3d at 121). The ALJ failed to account for the limitations as set forth by Dr. Qureshi, which was not inconsistent with or contradicted by other substantial evidence. Thus, we conclude that the ALJ's residual functional capacity determination is in error as it is not supported by substantial evidence.

For similar reasons, and for the reasons set forth in our analysis, we also conclude that the ALJ erred in disregarding the vocational expert's response that Ms. Bechtel would be eliminated from all jobs based on her inability to maintain attention and concentration. (R. at 337-338.) Given our evaluation of the evidence, our findings and conclusions, we therefore adopt the vocational expert's response that Ms. Bechtel is not able to be employed and thus not able to perform substantial gainful activity. Therefore, we find that she is disabled. Accordingly, we will reverse the decision of the Commissioner and remand for an award of benefits.

V. **Conclusion**

For the foregoing reasons, we conclude that there is not substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's motion for summary judgment is denied. In addition, for the above stated reasons, the decision of the Commissioner denying Plaintiff's claim for disability insurance benefits must be reversed. This matter is remanded to the Commissioner for insurance benefits to be calculated and awarded to Plaintiff.

An appropriate order will be entered.

March 28, 2007
Date

Maurice B. Cohill, Jr.
Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc: counsel of record